UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRYAN GLOVER and BARBARA GLOVER, husband and wife,<br>    Plaintiffs | : | |
| | : | |
| | : | |
| v. | : | Civil Action No. 04 – 209 Erie |
| | : | |
| MARVIN WINDOWS and DOORS, a/k/a MARVIN WINDOWS, a/k/a MARVIN LUMBER AND CEDAR COMPANY, a/k/a MARVIN WOOD PRODUCTS,<br>    Defendant | : | Judge Sean J. McLaughlin |
| | : | |
| | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

AND NOW, come the Plaintiffs, Brian and Barbara Glover, through their attorneys, Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc., and respectfully submit this response to the Defendants' Motion for Summary Judgment.

### INTRODUCTION

1.    Denied.  The Plaintiffs, Brian and Barbara Glover, have filed this action alleging that the Integrity brand windows and doors which they purchased and installed in their residence in 1996 and 1998 have manifested substantial defects in the quality and workmanship, which allow for excessive heat transfer resulting in excessive condensation on the inside surface of the windows and causing property damage to the windows and doors.

2.    Admitted.

3.    Admitted.

I.     **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF CONTRACT CLAIM AND IT IS NOT BARRED BY THE STATUTE OF LIMITATIONS.**

4.     Admitted.

5.     Admitted.

6.     Admitted.

7.     Admitted in part and denied in part.  It is admitted that the Plaintiffs did not initiate the lawsuit until October 1, 2003.  It is denied that the initiation of this lawsuit occurred more than four years after the breach of contract claim accrued.  Under the discovery rule, the statute of limitations would have been tolled until the Plaintiffs knew or reasonably should have known that there had been an injury and that the injury had been caused the Defendants' defective windows.  Pierce v. Salvation Army, 674 A.2d 1123, 1125 (Pa. Super. 1996).  The Plaintiffs should not have reasonably known that there was a problem with their windows until the winter of 2000 which would put them well within the statute of limitations for a breach of contract action since this claim was filed in October of 2003.

8.     Denied.  The Plaintiffs' breach of contract claim is not barred by applicable statute of limitations and judgment should be not entered in favor of the Defendants under Count I of the Complaint.

II.    **THE CLAIMS FOR BREACH OF EXPRESS AND IMPLIED WARRANTY IS IN VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.**

9.     Admitted.

10.    Admitted.

11.     Denied.  Under the discovery rule, the Plaintiffs' cause of action for breach of warranty did not accrue in 1996 and 1998, but did accrue when the Plaintiffs knew, or reasonably should have known, that they had suffered an injury and that the injury had been caused by the Defendants' defective windows which did not occur until the winter of 2000.

12.     Denied.  The Plaintiffs brought their claims for breach of express warranty, breach of implied warranty, and violation of the Magnuson-Moss Warranty Act within the four years of each applicable statute of limitations.

## III.     THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.

13.     Admitted.

14.     Admitted.

15.     Denied.  It is the Plaintiffs' position that the statute of limitations for the UTPCPL were tolled until the Plaintiffs knew, or should have reasonably known, that they had sustained an injury and that the injury was caused by the Defendants' defective windows.  Until that time, the Plaintiffs had been unaware that the Defendants had made any fraudulent misrepresentations or engaged in deceptive practices regarding the quality of the windows.

16.     Denied.  The Plaintiffs' claims under the UTPCPL are not barred by the statute of limitations as the claims were filed within the six year statute of limitations.

IV.    **THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW CLAIMS ARE NOT BARRED BY THE ECONOMIC LOSS DOCTRINE.**

17.    Admitted.

18.    Denied.  Pennsylvania State Courts have not applied the Economic Loss Doctrine to claims under the Pennsylvania Uniform Trade Practices and Consumer Protection Law.  Therefore, the Economic Loss Doctrine is not applicable to the Plaintiffs' claim under the UTPCPL.

V.    **SUMMARY JUDGMENT IS NOT WARRANTED IF THERE IS EVIDENCE THAT THE INTEGRITY WINDOWS WERE DEFECTIVELY DESIGNED AND/OR MANUFACTURED.**

19.    Denied.  There is sufficient evidence contained in the record via a report from Duane Davis and the testimony of Tyler Mervin that these windows were defective and that the defect caused the property damage claimed in Plaintiffs' Complaint.

20.    Denied.  The Plaintiffs' evidence clearly establishes that there is a defect in the Marvin Integrity Windows that has caused the damaged alleged in the Plaintiffs' Complaint.

WHEREFORE, the Plaintiffs, Brian and Barbara Glover, respectfully request that this Court deny the Defendants' Motion for Summary Judgment.

Respectfully Submitted,

QUINN, BUSECK, LEEMHUIS, TOOHEY &
KROTO, INC.

By _____
      Bryan D. Fife, Esq.
      2222 West Grandview Boulevard
      Erie, PA  16506-4508
      (814) 833-2222
      Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

BRYAN GLOVER and BARBARA          :
GLOVER, husband and wife,         :
    Plaintiffs              :
                            :
            v.      :    Civil Action No. 04 – 209 Erie
                            :
MARVIN WINDOWS and DOORS,         :    Judge Sean J. McLaughlin
a/k/a MARVIN WINDOWS, a/k/a       :
MARVIN LUMBER AND CEDAR           :
COMPANY, a/k/a MARVIN WOOD        :    JURY TRIAL DEMANDED
PRODUCTS,                         :
    Defendant               :

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 22nd day of July, 2005, the foregoing

Response to Motion for Summary Judgment was mailed via U.S. first class mail to the

following:

G. Jay Habas, Esq.
1001 State St., Suite 1400
Erie PA 16501

By _____
      Bryan D. Fife, Esq.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

BRYAN GLOVER and BARBARA          :
GLOVER, husband and wife,         :
    Plaintiffs                  :
                      :
           v.                     :    Civil Action No. 04 – 209 Erie
                      :
MARVIN WINDOWS and DOORS,         :    Judge Sean J. McLaughlin
a/k/a MARVIN WINDOWS, a/k/a       :
MARVIN LUMBER AND CEDAR           :
COMPANY, a/k/a MARVIN WOOD        :    JURY TRIAL DEMANDED
PRODUCTS,                         :
    Defendant                   :

## **ORDER**

    AND NOW, to-wit, this _____ day of _____, 2005, it

is hereby Ordered, Adjudged and Decreed that the Defendants' Motion for Summary

Judgment is DENIED.


                                 _____
                                              J.

Document #259118, v1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

BRYAN GLOVER and BARBARA
GLOVER, husband and wife,
    Plaintiffs

            v.              :    Civil Action No. 04 – 209 Erie

MARVIN WINDOWS and DOORS,    :    Judge Sean J. McLaughlin
a/k/a MARVIN WINDOWS, a/k/a
MARVIN LUMBER AND CEDAR
COMPANY, a/k/a MARVIN WOOD    :    JURY TRIAL DEMANDED
PRODUCTS,
    Defendant

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION OF MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Bryan and Barbara Glover ("Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs initiated this cause of action by Writ of Summons on October 1, 2003. (See Writ of Summons, Exhibit A).  In their Complaint, Plaintiffs allege that the windows installed in their new home have manifested substantial defects in quality and workmanship.  These defects allow for excessive heat transfer resulting in excessive condensation which has caused significant property damage to the windows. (See, Complaint, Exhibit B, pp. 2-3).

In October 1996, the original thirty-two (32) windows were installed in the Plaintiffs' home Bryan Glover and Mike Paris. (Deposition Testimony of Bryan Glover, Exh. C, pp. 8 & 62).  Although the Glovers first noticed condensation on the windows in December of 1996, they had no idea that it was caused by the defect with the windows. (Affidavit of Barbara Glover,  Exh. D, p. 1, ¶ 6). In fact, the Plaintiffs indicated that

initially it was their understanding that the home being under construction, that the home was unoccupied, and the temporary heat might cause the condensation that was occurring on the windows, so they didn't think much of it and kept them wiped down. (B. Glover, Exh. C, p. 63; Affidavit of Barb Glover, Exh. D, ¶ 6).  Since the condensation problem was a "heating season" phenomenon, the Glovers did not have any problems with the windows until the following winter of 1997-1998. (Affidavit of Barb Glover, Exh, D, ¶ 7)  Once again they were not concerned because condensation is a common side effect of the settling process of a newly constructed home. (B. Glover,  Exh, C, p. 64; Affidavit of Barb Glover, Exh. D, ¶ 9).

In the spring of 1998, thirteen (13) of the original thirty-two (32) windows were replaced due to problems with the wood cladding around the interior glass pane becoming "soft" due to a defect unrelated to the condensation. (B. Glover, Exh. C, pp. 43-44; Affidavit of Barb Glover, Exh. D, ¶ 10).  A local window representative, Bennett Supply, replaced the 13 windows with new Marvin Integrity windows. (B. Glover, Exh. C, pp. 41-42, 44). In the winter of 1998-1999, the condensation problem continued following the replacement of the windows, however, the cause of the condensation problem was uncertain and the wood around the windows appeared to be unaffected. (Affidavit of Barb Glover, Exh. D, ¶ 11).

In the winter of 1999-2000, the condensation reappears on the windows throughout the house, and the Plaintiffs become concerned that this is continuing to occur.  (Affidavit of Barb Glover, Exh. D, ¶ 12).  They begin asking around to see if anyone has any ideas as to the cause of the condensation problem. (Id.)  Then in the winter of 2000-2001, the Plaintiffs contacted the distributor from whom they purchased

the windows regarding the possible problems with the windows.  They are directed to a new representative, A.W. Hastings and arranged for a Hastings' representative to come to their home to inspect the windows.  The representative never comes to inspect the windows, and Hastings will not return their calls.  (Affidavit of Barb Glover, Exh. D, ¶ 13).

In the summer of 2001, the Plaintiffs are informed by a Marvin Windows corporate representative that the problem is not with the windows, but with the humidity in their home. (Affidavit of Barb Glover, Exh. D, ¶ 14). The Plaintiffs check the humidity levels, but everything is within reasonable limits.  In the fall/winter of 2001, they again call Marvin Windows for assistance.  They are again told that the problem is with the humidity in their home and not with the windows, and receive a packet of information from Marvin regarding condensation on windows and the many causes of the condition. (Affidavit of Barb Glover, Exh. D, ¶ 15).

By the end of 2001, the windows are beginning to show signs of decay, and ice is beginning to form on the inside of the windows.  The Plaintiffs again call Marvin and are told that they will be contacted in the fall of 2002 to set up an appointment for a representative from Marvin to come and inspect the windows.  (Affidavit of Barb Glover, Exh. D, ¶ 16).  In December 2002, the Plaintiffs are informed that a representative from Marvin will be coming in January 2003 to inspect the windows.  During the inspection, the representative tests the humidity levels which fall within the warranty guidelines and states that he "doesn't know what is wrong with the windows" but assures the Plaintiffs that "Marvin Windows stands behind its windows and that the problem will be taken care of." (Affidavit of Barb Glover, Exh. D, ¶ 17). In late January 2003, the Plaintiffs are

contacted by a customer service representative who indicates that he has concluded

that the problem they are having is a humidity problem with their home, and not a

problem with their windows. (Affidavit of Barb Glover, Exh. D, ¶ 18).

I.      **Plaintiffs' Claims of Breach of Contract, Breach of Warranty, Violation of the Magnuson-Moss Act, and the UTPCPL Are NOT Barred by the Applicable Statute of Limitations**

In this case, the Defendant has moved to dismiss all of Plaintiffs' claims on the

basis that they are barred by the applicable statute of limitations for each claim.  The

Plaintiffs do not dispute the applicable statute of limitations set forth in Defendant's

Memorandum in Support of the Motion for Summary Judgment, i.e. breach of contract –

four years, breach of warranty – four years, violation of Magnuson-Moss Warranty Act –

four years, and violation of Unfair Trade Practices and Consumer Protection Law – six

years.  However, the Plaintiffs do dispute when the applicable statute of limitations

would have begun to run in light of the discovery rule.

As a general rule, it is the duty of the party asserting a cause of action to use all

reasonable diligence to properly inform himself of the facts and circumstances upon

which the right of recovery is based and to initiate suit within the prescribed period.

Hayward v. Medical Center of Beaver County, 608 A.2d 1040 (Pa. 1992).  Thus, the

statute of limitations begins to run as soon as a right to institute and maintain suit arises.

Pocono International Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468 (Pa. 1983).

However, in some circumstances, although the right to institute suit may arise, a party

may not, despite the exercise of diligence, reasonably discover that he has been

injured.  In such cases the statute of limitations does not begin to run at the instant the

right to institute suit attaches, rather the discovery rule applies. <u>Amodeo v. Ryan</u>
<u>Homes, Inc.</u>, 595 A.2d 1232 (Pa. Super. 1991).

The discovery rule is a judicially created device which tolls the running of the
applicable statute of limitations until the point where the complaining party knows or
reasonably should know that he has been injured and that his injury has been caused
by another party's conduct. <u>Pearce v. Salvation Army</u>, 674 A.2d 1123, 1125 (Pa. Super.
1996).  Under the discovery rule, the point at which the complaining party should
reasonably be aware that he has suffered an injury is a factual issue "best determined
by the collective judgment, wisdom and experience of jurors." <u>White v. Owens-Corning</u>
<u>Fiberglas Corp.</u>, 668 A.2d 136, 144 (Pa. Super. 1995)(quoting <u>Petri v. Smith</u>, 453 A.2d
342, 347 (Pa. Super. 1982), appeal denied, <u>White v. Owen-Corning</u>, 683 A.2d 885 (Pa.
1996)).  Therefore, once the statute of limitations has been properly tolled, only where
the facts are so clear that reasonable minds cannot differ may the commencement of
the limitations period be determined as a matter of law.  <u>Hayward</u>, 608 A.2d at 1043.

Under the discovery rule, the statute of limitations would begin to run when the
Plaintiffs knew or should have known that they had been injured and that their injury
was caused by the Defendant's conduct or actions.  The Defendants assert that the
condensation on the windows triggered the beginning of the statute of limitations time
period.  However, the mere appearance of condensation on the windows would not
indicate that the windows were defective and that the windows were going to decay and
rot over time.

It is the Plaintiffs' position that the Plaintiffs did not and would not have known
that there was a problem with their home caused by the defective windows until the

winter of 2000-2001 when the wood on the windows began showing signs of mold.  It should first be noted that the condensation would only appear on the windows during the winter months.  Moreover, although the windows were installed in 1996, the Plaintiffs did not occupy the home until August 1997, and from 1996 until summer of 1997, the house was still under construction.  After they moved into the home, there was condensation on the windows in 1997-1998, however, it was their understanding that condensation on the windows is to be expected in a newly constructed home.  As such, Plaintiffs had no reason to believe that there was anything wrong the windows or anything else, other than they had a newly constructed home that was "settling".  Under the discovery rule, the Plaintiffs did not know that they had suffered an injury caused by the defective windows until the appearance of the mold on the windows in 2000.

Therefore, under the discovery rule, none of the Plaintiffs' claims should be barred by the applicable statute of limitations.  Based on the above facts, the statute of limitations of each claim would have been tolled until such time as the Plaintiffs knew or should have known of the injury and the cause of the injury by these defective windows.  The earliest that the Plaintiffs would have known of a possible defect would have been in 2000.  Since suit was filed in 2003, the claims under breach of contract, breach of warranty, and violation of the Magnuson-Moss Act are not barred as the statute of limitations would not have expired until 2004.  As for the UTPCPL claim, it is likewise not barred as the statute of limitations is six years, which would mean the claim needed to be filed prior to 2006.

In the alternative, Defendant's should be precluded from raising the statute of limitations as a defense under the theory of equitable estoppel.  The discovery rule

effectively tolls the statute of limitations, but the estoppel doctrine precludes the

defendant from raising the statute of limitations as a defense.  See, Connaught

Laboratories, Inc. v. Lewis, 557 A.2d 40 (Pa. Cmwlth. 1989), fn. 2.  In order for the

doctrine of equitable estoppel to be applied in bar of the statute of limitations, the

plaintiff must prove that the defendant caused him to relax his vigilance by some

affirmative fraud, deception or concealment of fact.  Nesbitt v. Erie Coach Company,

204 A.2d 473 (Pa. 1964).  However, this does not mean fraud in the strictest sense

encompassing the intent to deceive, but may be fraud in the broadest sense which

includes an unintentional deception.  Walters v. Ditzler, 227 A.2d 833, 835 (Pa. 1967).

It is not the intention of the party estopped but the natural effect on the other

party which gives vitality to an estoppel.  Nesbitt, at 476 (*citing* 5 Williston, Contracts §

691 (3rd. ed. 1961).  As stated in Schwab v. Cornell, 160 A. 449, 450 (Pa. 1932):

> If the circumstances are such that a man's eyes should have been
> open to what is occurring, then the statute begins to run from the time
> when he could have seen, but if by concealment, through fraud *or*
> *otherwise*, a screen has been erected by his adversary which effectually
> obscures the view of what has happened, the statute remain quiescent
> until actual knowledge arises.

As previously indicated, thirteen (13) of the original 32 windows were replaced by

Marvin via a local distributor in the summer of 1998.  Within two years of the installation

of these new windows, Plaintiffs began complaining to Marvin and/or the distributor their

windows had a lot of condensation and were defective.  Marvin continually maintained

that there was nothing wrong with the windows, but that the problem was with the level

of humidity in their home.  Marvin even went to the extent of sending a packet of

information to the Plaintiffs on known causes of condensation. (See, Affidavit of Barb

Glover, Exh. D). The Plaintiffs continued to contact Marvin regarding the condensation

7

on their windows, and their belief that there was something wrong with the windows. Marvin continued to deny any problems with the windows and sent a representative to inspect. Following his inspection, the representative determined that the humidity level was too high in their home.

It is clear that the Defendant's continuous denial of any defect and assertion that it was the humidity level in the Plaintiffs' home caused them to relax and look elsewhere to determine what was the cause of the condensation. Basically, you have the private consumer contacting the window experts regarding a condensation which they believe to be caused by the defective windows. The experts, one would presume, opine that it is not the windows but the level of humidity in the home. Their own representative even inspected the property and reported that the humidity level was too high in the home. Based on the assertions made by Marvin, the Plaintiffs were "induced to relax their vigilance" in pursuing this claim. If the experts in the field are indicating that it is not a defect, but some other cause, the law can not expect the Plaintiffs to reasonably know that there is a problem and to continue to pursue that matter.

In short, we have a case where the Defendant intentionally or unintentionally deceived the Plaintiffs into believing that there was nothing wrong with the windows to the extent that the Plaintiffs were induced to pursue the claims that their house had high levels of humidity versus defective windows. Absent the misstatements by the Defendants, the Plaintiffs would have taken the necessary steps to determine that the windows were in fact defective and could then have filed suit sooner within the applicable statute of limitations.

As such, the Plaintiffs respectfully request this Honorable Court to deny Defendant's Motion for Summary Judgment.

## II. Plaintiffs' Pennsylvania Unfair Trade Practices and Consumer Protection Law Claims Are NOT Barred by Pennsylvania's Economic Loss Doctrine

The economic loss doctrine does not bar plaintiffs' Unfair Trade Practices and Consumer Protection Law (UTPCPL) claim found in Count V of the Complaint.  In Pennsylvania, the purpose of the economic loss doctrine is to maintain the separate sphere of the law of contract and tort.  New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp., 564 A.2d 919, 925 (Pa. Super. 1989).  Pennsylvania's economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract."  Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 606, 618 (3d Cir. 1995).  As stated in Defendant's brief, negligence and strict liability theories do not apply in an action between commercial enterprises involving a product that malfunctions where the only resulting damage is to the product itself. REM Coal Co. v. Clark Equipment Co., 563 A.2d 128, 134 (Pa. 1989).

The Defendants rely on the Third Circuit opinion in Werwinski v. Ford Motor Co., 286 F.3d 661 (3d Cir. 2002) for the proposition that UTPCPL claims are barred by the economic loss doctrine.  However, the Pennsylvania Common Pleas Court have ruled that the economic loss doctrine does not apply to intentional tort claims.  First Republic Bank v. Brand, 50 Pa. D.&C.4th 329, 340 (2000).  Similarly, the doctrine does not bar Plaintiffs' UTPCPL claims regarding alleged misrepresentations. See, Zwiercan v. General Motors Corp., 2002 WL 31053838 (Pa.Com.Pl.).

Prior to the Werwinski decision, Pennsylvania's Common Pleas Courts were unanimous in refusing to apply the economic loss doctrine even in common law intentional fraud claims. *See e.g.*, Oppenheimer v. York Intern., 2002 WL 31409949, at 7 (Pa. Comm. Pl. Oct. 25, 2002) ("[T]his court has not extended the economic loss doctrine to cover intentional torts;" "This court does not believe that intentional misrepresentation and outright dishonesty, if they can indeed be proven, are properly redressed by breach of contract or warranty action.")

The court in Oppenheimer stated:

> It seems fair to suggest that at the time the Pennsylvania legislature enacted the statute "to be liberally construed to prevent unfair or deceptive purposes," it was fully cognizant of the existence of common law contract remedies. It defeats the statute's purposes, particularly its provisions for private consumer actions, to apply the economic loss doctrine to bar the claims it created. As stated by this court, "to apply the economic loss doctrine to all claims under the UTP/CPL has the potential to eviscerate the UTP/CPL itself." (citations omitted).
> 2002 WL 31409949 at *6-7.

In Zwiercan v. General Motors Corp., supra, at *9, the court also held that a UTPCPL claim should not be barred by the economic loss doctrine. The court held:

> To apply the economic loss doctrine to bar the Plaintiff's statutory claim here would frustrate the intent of the UTPCPL, in this context, and would be inconsistent with the purpose of the economic loss doctrine. This is not a case where the Plaintiff is attempting to bring a tort action in lieu of a breach of contract claim. If the doctrine were to bar the Plaintiff's action, the Plaintiff would be estopped from litigating a claim which the legislature specifically provided for when it amended the UTPCPL to protect against deceptive practices.
> Id.

Following the Wierwinski opinion, the Pennsylvania courts continued to refuse to apply the economic loss doctrine to UTPCPL claims. *See*, Smith v. Reinhart Ford, 68 Pa. D.&C.4[th] 432 (2004)( "[E]ven though the Third Circuit ruled that the doctrine barred

such claims, and predicted that he Pennsylvania Supreme Court would rule likewise, Pennsylvania state courts have refused to apply the doctrine to UTPCPL claims."); O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266 (E.D. Pa. 2003)("Pennsylvania's economic loss doctrine is inapplicable to intentional torts."  Plaintiff's entitlement does not stem solely from contract law, because his entitlement to recovery also stems from Pennsylvania statutory law under the UTPCPL).

In this case, the Plaintiffs have alleged that the Defendant has engaged in fraudulent and deceptive conduct in violation of Pennsylvania's UTPCPL.  The Plaintiffs have alleged that not only did the Defendant represent that the windows were of a superior quality, the Defendant also represented that the windows were covered by a warranty which they have failed to comply with.  These representations were intentional and fraudulent, and have properly been asserted under the UTPCPL.  Furthermore, the Pennsylvania courts have agreed that the economic loss doctrine does not apply to intentional torts and/or claims of fraud brought under the UTPCPL.

Thus, Defendant's Motion for Summary Judgment on this issue of the economic loss doctrine barring Plaintiffs' UTPCPL claim should be denied.

**III.  Plaintiffs Can Establish That The Marvin Integrity Windows Were Defectively Designed and/or Manufactured.**

Defendant asserts that the Plaintiffs cannot identify any experts who have confirmed that the Marvin Integrity Windows installed in the Plaintiffs' home are defective or bad.  However, counsel for the defense has already deposed two individuals with the expertise to render an opinion as to whether the windows were defective.  Both of these individuals have expressed their opinions that the windows installed in the Plaintiffs' home are defective and/or bad.

On March 28, 2004, Duane Davis conducted an inspection of the Plaintiffs' home for the purpose of determining the cause of the deterioration of the windows and doors in their home.  As Mr. Davis states in his report of April 5, 2004, he has owned his on business, Duane Davis Construction, for the past 20 years in which he specializes in "new homes, replacement windows, additions, remodeling, garages, siding, home maintenance, and seamless gutters."  (See report of Duane Davis date April 5, 2004 attached hereto as Exhibit  E, ¶2).  Prior to starting his own business, Mr. Davis worked an additional 10 years with another contractor in the same field.  (Exhibit E, ¶ 2).

Upon his initial inspection of the property, Mr. Davis found that the windows and doors were properly installed, and there was no evidence of moisture or water damage anywhere within there home. (Exhibit  E, ¶ 3).  Mr. Davis then disassembled one of the extra windows that the Plaintiffs had in their basement, which was the same window installed in the Plaintiffs' home.  Following his inspection of the window, Mr. Davis concluded that the rubber seal contained in the window had failed which allowed air to leak in around the glass and the wood cladding.  (Exhibit E, ¶4).  "The air is leaking between the outside frame and the glass as well as the glass and the wood cladding." (Exhibit E, ¶4).  Mr. Davis further concluded that the amount of and poor adhesive quality of the rubber sealant as well as the fit of the glass to the outside frame was causing the cold air from the outside to enter the home and is causing the excessive moisture and ice on the windows and doors resulting in the decaying conditions of the windows. (Exhibit E, ¶ 4).

Moreover, Mr. Davis noted the presence of mold and green algae growing between the outside frame and glass, down in the sealant, which is further evidence that the sealant had failed. (Exhibit E, ¶ 5).

Additionally, Mervin Tyler, an outside sales representative with Pella windows, testified that, based on his experience in the window business, the windows in the Plaintiffs' home were defective. Mr. Tyler has worked as an outside sales representative for Pella windows since 1997. (See Deposition Testimony of Mervin Tyler dated June 13, 2005, Exh. F, p. 4). Prior to that, Mr. Tyler owned a construction business for twenty-six (26) years. (Tyler, Exh. F, p. 3). His construction business initially involved remodeling, roofing and siding, and insulation. (Tyler, Exh. F, p. 24). Later, he became an installer for Pella windows until he gave up the business in 1997. (Tyler, Exh. F, pp. 24-25).

Mr. Tyler testified that during his inspection of the windows, he found a seal failure in the sash of the windows. (Tyler, Exh. F, p. 12). He indicated that the failure of the seal had allowed water to migrate in and cause the wood on the inside of the window to deteriorate. (Tyler, Exh. F, p.12). More specifically, Mr. Tyler testified that there was a breach of the ability of the window sash to keep water from passing by the cladding and the glass. (Tyler, Exh. F, p. 12). Mr. Tyler further indicated that "I am quite familiar with seal failure," and it looked like the sash had failed in the ability to keep the water out, and "it need replaced." (Tyler, Exh. F, pp. 18-19).

Based on the report authored by Duane Davis and the testimony of Mervin Tyler, it is clear that the Marvin Integrity Windows installed in the Plaintiffs' home are defective and do not conform to the quality of window as promised by Marvin. It is the Plaintiffs'

position that both Duane Davis and Mervin Tyler have sufficient knowledge and

expertise in the area of window installation and construction to render opinions on

whether the windows are defective. More importantly, the findings of these two experts

are sufficient to create a genuine issue of fact on the issue of whether the windows are

defective.

As such, the Plaintiffs' have produced sufficient evidence to prove that the Marvin

Integrity Windows are defective and do not conform to the quality as promised by the

Defendant.

## IV.    Conclusion

For the above-stated reasons, the Plaintiffs respectfully request that this Court

deny the Defendant's Motion for Summary Judgment.

Respectfully submitted,

QUINN, BUSECK, LEEMHUIS, TOOHEY &
KROTO, INC.

By _____
Bryan D. File
Pa. ID 83345
2222 West Grandview Blvd
Erie, PA 16506
(814) 833-2222
Attorneys for Bryan and Barbara Glover

14



BRYAN GLOVER and BARBARA GLOVER,           )
husband and wife                           )
                                           )         IN THE COURT OF COMMON PLEAS
                        Vs.                )
                                           )         OF ERIE COUNTY, PENNSYLVANIA
                                           )
MARVIN WINDOWS and DOORS                   )
a/k/a MARVIN WINDOWS, a/k/a                )
MARVIN LUMBER AND CEDAR COMPANY,           )         NO.    14007-2003
a/k/a MARVIN WOOD PRODUCTS,                )
                   Defendants              )
                                           )
                                           )
                                           )
                                           )
                                           )
                                           )
                                           )

## WRIT OF SUMMONS

TO:    The Above Named Defendants

      You are hereby notified that the above named plaintiff(s) has (have)
commenced an action against you.

Copies of all pleadings filed should be served upon plaintiff(s) counsel:

  Kenneth W. Wargo, Esq.
  Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc.
  2222 West Grandview Blvd.
  Erie, Pa. 16506-4508
  (814) 833-2222

**Dated:** October 1, 2003

                                  Patrick L. Fetzner, Clerk of Records
                                  Prothonotary Division

                                  By: _____
                                              Deputy

B

BRYAN GLOVER and BARBARA      :     IN THE COURT OF COMMON PLEAS
GLOVER, husband and wife,         :     OF ERIE COUNTY, PENNSYLVANIA
     Plaintiffs                 :
                          :
           v.               :
                          :
MARVIN WINDOWS and DOORS,     :     NO. 14007 - 2003
a/k/a MARVIN WINDOWS, a/k/a     :
MARVIN LUMBER AND CEDAR      :
COMPANY, a/k/a MARVIN WOOD    :
PRODUCTS,                   :
     Defendant             :

### NOTICE TO DEFEND

TO:    Marvin Windows and Doors,
        a/k/a Marvin Windows, a/k/a
        Marvin Lumber and Cedar Company,
        a/k/a Marvin Wood Products
        P.O. Box 100
        Warroad, MN 56763

     YOU ARE BEING SUED IN COURT.  IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU.  YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF.  YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU.

     **YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

     **IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

LAWYERS REFERRAL SERVICE
302 WEST NINTH STREET
ERIE, PENNSYLVANIA  16502-1427
(814) 459-4411
Monday-Friday, 8:30 a.m. to 3:00 p.m.

TRUE COPY ATTEST

_PROTHONOTARY_

_Kenneth W. Wargo_
Kenneth W. Wargo
Pa. Id. No. 47020
Attorney for Plaintiffs

BRYAN GLOVER and BARBARA
GLOVER, husband and wife,
  Plaintiffs

     v.

MARVIN WINDOWS and DOORS,
a/k/a MARVIN WINDOWS, a/k/a
MARVIN LUMBER AND CEDAR
COMPANY, a/k/a MARVIN WOOD
PRODUCTS,
  Defendant

 :
 :
 :
 :
 :
 :
 :
 :
 :
 :
 :
 :
 :

IN THE COURT OF COMMON PLEAS
OF ERIE COUNTY, PENNSYLVANIA

NO. 14007 - 2003

## COMPLAINT

  Plaintiffs, by and through their attorneys, Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc., file the following Complaint against the Defendants, stating in support thereof as follows:

  1. Plaintiffs are adult individuals, husband and wife, residing in Edinboro, Pennsylvania.

  2. Defendant Marvin Windows and Doors, a/k/a Marvin Windows, a/k/a Marvin Lumber and Cedar Company, a/k/a Marvin Wood Products is, upon information and belief, a Minnesota corporation with an address of P.O. Box 100, Warroad, Minnesota.

  3. In or about August 1996 Plaintiffs were in the process of having their current residence built and required windows for the residence.

  4. Defendant is in the business of manufacturing and selling windows, including windows for residential use.

  5. On or about August 2, 1996 Plaintiffs contracted through a local company named LOC, Inc. to purchase windows to be installed and used in the new residence

they were constructing. The windows were manufactured by the Defendant and were low energy argon gas filled units sold by Defendant under the trademark of "Integrity" windows. Attached hereto as Exhibit A and made a part hereof is a true and correct copy of the purchase order for the Integrity windows.

6.     In deciding to purchase the Integrity windows from Defendant, Plaintiffs relied on representations made by the Defendant that they were "superior windows" with "an exceptional warranty."

7.     In addition to making representations about the quality of the Integrity windows, Defendant also provided an express warranty for the windows which provided, in part, as follows:

> Integrity Windows & Doors are warranted for ten (10) years after sale to be of high quality workmanship and materials, and to be free from defects which might render the windows and doors unserviceable. We agree to repair or replace, at our option and without charge to you, any items which might be defective.

Attached hereto as Exhibit B and made a part here of is a true and correct copy of the express warranty which was included with the Integrity windows.

8.     After the Integrity windows were received by Plaintiffs they were installed in due course in the Plaintiffs' new residence, all in accordance with the Defendants' specifications.

9.     Since being installed in Plaintiffs' residence, the Integrity windows purchased from the Defendant have manifested substantial defects in quality and workmanship in that the windows allow for excessive heat transfer, which results in excessive condensation on the inside surface of the windows.

10.    As a result of the excessive heat transfer and condensation, over the years since the windows were installed moisture has damaged the interior wooden surfaces of the windows, and the windows require replacement.

11.    Plaintiffs have made repeated inquiries and requests to the Defendant concerning replacement of the defective windows, but Defendant has failed and refused to act on such inquiries and requests.

12.    The defective windows materially impair the value of the Plaintiffs' residence, result in excessive heat loss from the residence, result in an unsightly appearance to the residence, and impair the ability of Plaintiffs to sell the residence to any third parties.

13.    Defendant has breached its contract and warranties to the Plaintiffs by supplying them with windows that were defective and not fit for the purpose for which they were intended.

### Count I – Breach of Contract

14.    Paragraphs 1 through 13 above are incorporated as though fully set forth herein.

15.    Plaintiffs entered into a contract with the Defendant for the purchase of the Integrity windows, by and through the agency of LOC, Inc.

16.    Defendant has breached the contract by supplying defective windows.

17.    Plaintiffs have been damaged by Defendants' breach of contract in the amount of $44,363.00 representing the cost to secure and install replacement windows, plus other incidental and consequential damges.

WHEREFORE, Plaintiffs respectfully request that this court enter judgment in their favor and against the Defendant in the amount of $44,363.00, plus award interest, costs and such other relief as the court may deem just.

## Count II – Breach of Express Warranty

18.    Paragraphs 1 through 13 above are incorporated by reference as though fully set forth herein.

19.    Defendant has failed to honor its express warranty to repair or replace the defective windows.

20.    Plaintiffs have been damaged by Defendants' breach of warranty in the amount of $44,363.00 as a result of Defendants failure to honor its express warranty.

WHEREFORE, Plaintiffs respectfully request that the court enter judgment in their favor and against the Defendant in the amount of $44,363.00 due to Defendants breach of its express warranty, and failure to replace the defective windows, plus that the court award interest, costs, and such other relief as it deems just.

4

## Count III – Breach of Implied Warranty

21.    Paragraphs 1 through 13 above are incorporated by reference as though fully set forth herein.

22.    The Uniform Commercial Code, as adopted by the Commonwealth of Pennsylvania, provides for an implied warranty of merchantability on the sales of goods at 13 Pa. C.S.A. § 2314.

23.    Any attempt by Defendant to disclaim or limit the implied warranty of merchantability fails because of the failure of Defendant to honor the express warranty to repair or replace the defective windows.

24.    The Integrity windows purchased by Plaintiffs from Defendant are not a merchantable product due to the defects as set forth herein.

25.    Plaintiffs have been damaged in the amount of $44,363.00 because of the breach of the implied warranty of merchantability by the Defendant.


WHEREFORE, Plaintiffs respectfully request that the court enter judgment in their favor and against the Defendant in the amount of $44,363.00 for Defendants' breach of the implied warranty of merchantability, plus that the court award costs, interest, and such other relief as it may deem just.


## Count IV – Magnuson - Moss Warranty Act

26.    Paragraphs 1 through 13, 19-20, and 22-25 above are incorporated by reference as though fully set forth herein.

5

27.    For Defendants' failure to comply with its implied warranty of merchantability and express warranty, Plaintiffs seek damages pursuant to the Magnuson – Moss Warranty Act, 15 U.S.C. 2301, et. seq., and specifically including 15 U.S.C. § 2310 (d).

28.    Plaintiffs further claim a right to recovery of attorneys fees incurred by them in attempting to assert their rights under the warranties provided by the Defendant.


WHEREFORE, Plaintiffs respectfully request that the court enter judgment in their favor and against the Defendant and award damages for breach of warranty in the amount of $44,363.00, plus incidental and consequential damages for inconvenience and time and expense for being forced to live with the defective windows and to prosecute this cause of action, and to award reasonable attorneys fee plus costs, plus such other relief as the court may provide.


## Count V – Pennsylvania Unfair Trade Practices and Consumer Protection Law

29.    Paragraphs 1 through 13 above are incorporated as though fully set forth herein.

30.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, ("PaUTPCPL") 73 P.S. § 201-1, et. seq., makes it unlawful to use unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. See 73 P.S. § 201-3.

31.    Defendant has violated the PaUTPCPL by representing that the Integrity windows had characteristics that they did not in fact have namely that they were of superior quality, in violation of 73 P.S. § 201-2 (4)(v).

32.    Defendant has violated the PaUTPCPL by representing that the Integrity windows were of a particular standard, quality, or grade, namely of superior quality, when they in fact were not, in violation of 73 P.S. § 201-2 (4)(vii).

33.    Defendant has violated the PaUTPCPL by failing to comply with the terms of any written guarantee or warranty given to the Plaintiffs at, prior to or after a contract for the purchase of the windows was made, in violation of 73 P.S. § 201-2 (4)(xiv).

34.    Defendant has violated the PaUTPCPL by engaging in any other fraudulent or deceptive conduct which creates the likelihood of confusion or of misunderstanding, in violation of 73 P.S. § 201-2 (4)(xxi).

35.    The Plaintiffs purchased the Integrity windows primarily for personal, family or household purposes, and they have suffered an ascertainable loss of money or property as a result of the use or employment by the Defendant of the unlawful methods, acts, practices as set forth in paragraphs 31 through 34 hereof.

36.    Plaintiffs have been damaged in the amount of $44,363.00 because of the defective windows supplied by the Defendant, and because of Defendants' engagement in unfair or deceptive acts or practices under PaUTPCPL..

37.    Plaintiffs claim treble damages as allowed under the PaUTPCPL, brining total damages to $133,089.00.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against the Defendant in the amount of $133,089.00, plus that the court award reasonable attorneys fees, costs, interest and such other relief as the court may deem just.

Respectfully submitted,

QUINN, BUSECK, LEEMHUIS, TOOHEY & KROTO, INC.

By _____
Kenneth W. Wargo, Esquire
Pa. ID No. 47020
2222 West Grandview Boulevard
Erie, PA 16506-4508
(814) 833-2222
Attorneys for Plaintiffs, Bryan and Barbara Glover

#218251

8

BRYAN GLOVER and BARBARA            :      IN THE COURT OF COMMON PLEAS
GLOVER, husband and wife,           :      OF ERIE COUNTY, PENNSYLVANIA
    Plaintiffs                      :
                                :
                    v.                :
                                :
MARVIN WINDOWS and DOORS,            :      NO. 14007 - 2003
a/k/a MARVIN WINDOWS, a/k/a         :
MARVIN LUMBER AND CEDAR             :
COMPANY, a/k/a MARVIN WOOD          :
PRODUCTS,                           :
    Defendant                       :

## <u>VERIFICATION</u>

       I, Bryan Glover, hereby depose and state that I am a plaintiff herein and that the averments set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to intentional falsification to authorities.

                                           _____
                                           Bryan Glover

Dated: _6-27-04_

BRYAN GLOVER and BARBARA     :    IN THE COURT OF COMMON PLEAS
GLOVER, husband and wife,    :    OF ERIE COUNTY, PENNSYLVANIA
    Plaintiffs           :
                       :
           v.           :
                       :
MARVIN WINDOWS and DOORS,     :    NO. 14007 - 2003
a/k/a MARVIN WINDOWS, a/k/a   :
MARVIN LUMBER AND CEDAR       :
COMPANY, a/k/a MARVIN WOOD    :
PRODUCTS,                     :
    Defendant            :

## <u>VERIFICATION</u>

    I, Barbara Glover, hereby depose and state that I am a plaintiff herein and that

the aveiments set forth in the foregoing Complaint are true and correct to the best of

my knowledge, information and belief. This Verification is made subject to the penalties

of 18 Pa.C.S.A. § 4904 relating to intentional falsification to authorities.


                                      _Barbara Glover_
                                      Barbara Glover


Dated:   6-27-04

# B/O DELIVERY

**LOC INCORPORATED**
**2727 WEST 18TH STREET**
**ERIE, PA 16505**

**814-833-7734**

| | |
|---|---|
| PAGE | |
| TERMS | CHARGE | 08/02/96 |

SOLD TO:   CUST # 49414   SHIP TO:   SHIP DATE

BRYAN AND BARB GLOVER          11467 EUREKA RD
645 WEST 23RD STREET
ERIE, PA          16502

CONTROL # 73870     DOC. # 67966     P. O. #
SPC INST     REFERENCE     SHIP VIA:     BO

| LN | ORDER | SHIP | BK/ORD | ITEM # | DESCRIPTION | PO # |
|----|-------|------|--------|--------|-------------|------|
| 1 | 2 | 2 | | NON STOCK | ICA 2135-1W RH | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGRITY. | |
| 2 | 1 | 1 | | NON STOCK1 | ICA 2135-2W L/R | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGRITY. | |
| 3 | 2 | 2 | | NON STOCK2 | ICA 2531-1W 1L/1R | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGRITY. | |
| 4 | 1 | 1 | | NON STOCK3 | ICA 2531-2W L/R | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGRITY. | |
| 5 | 2 | 2 | | NON STOCK4 | ICA 2547-2W L/R | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGRITY. | |
| 6 | 1 | 1 | | NON STOCK5 | ICA 2559-2W L/R | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGRITY. | |
| 7 | 1 | 1 | | NON STOCK6 | ICA 2963-2W L/R | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGRITY. | |
| 8 | 3 | 3 | | NON STOCK7 | ICA 2963-3W L/S/R | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGRITY. | |
| 9 | 9 | 9 | | NON STOCK8 | ICA 2919 ROTO OPER 1W | 10801 → shipped 8-2-96 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB, SCREEN BY INTEGR | |

CONTINUE NEXT PAGE

**EXHIBIT**

A

CONTINUE NEXT PAGE

**LOC INCORPORATED**
**2727 WEST 18TH STREET**
**ERIE, PA. 16505**

**B/O DELIVERY**

**814-833-7734**

PAGE          2        08/02/96
TERMS

SOLD TO:    CUST #    45414

SHIP TO:    SHIP DATE

BRYAN AND BARB GLOVER
645 WEST 23RD STREET
ERIE, PA              16502

11467 EUREKA RD

| CONTROL # | 73870 | DOC. # | 67966 | P. O. # | |
|-----------|-------|--------|-------|---------|---|
| SPC INST | | REFERENCE | | SHIP VIA | BO |

| LN | ORDER | SHIP | BK/ORD | ITEM # | DESCRIPTION | PO # |
|----|-------|------|--------|--------|-------------|------|
| | | | | | ITY. | |
| 10 | 4 | | 4 | NON STOCK0 | ICA 2963-1W STAT | 10801 |
| | | | | | LOW E ARGON, WHITE, 6 9/16" JAMB. | |

1. ALL TOWING CHARGES WILL BE PAID BY THE CUSTOMER.
2. NO RETURNS WITHOUT SALES RECIEPT.
3. SPECIAL ORDERS ARE NOT RETURNABLE.
4. NO MATERIAL RETURNS AFTER 30 DAYS.
5. PAST DUE ACCOUNTS SUBJECT TO 1 1/2% FINANCE CHARGE PER MONTH.

DATE SHIPPED _10-11-96_

CHECKED BY _SK_

DELIVERED BY _SK_

I RECEIVED THE ABOVE MATERIAL IN GOOD CONDITION  X

# INTEGRITY WINDOWS AND DOORS – LIMITED WARRANTY

Integrity Windows & Doors are warranted for ten (10) years after sale to be of high quality workmanship and materials, and to be free from defects which might render the windows and doors unserviceable. We agree to repair or replace, at our option and without charge to you, any items which may be defective. Of course, slight glass curvature or natural variations in color and texture of wood are not defects. We suggest that you inspect your Integrity Windows & Doors upon arrival and before installation and finishing.

### Conditions and Exceptions

This warranty shall only apply when your Integrity Windows & Doors are installed in accordance with the printed instructions provided. Any misuse, modification or alteration will void this warranty. Damage caused by such things as excessive condensation, corrosive atmosphere or water leakage (other than as a result of defects) is not covered by this warranty.

It is your responsibility to properly care for and protect new woodwork against moisture or excessive dryness, and to ensure that top and bottom edges and all surfaces of the woodwork are thoroughly painted or varnished. THIS WARRANTY SHALL NOT APPLY (1) IF NEW WOODWORK IS NOT PROTECTED AGAINST MOISTURE OR EXCESSIVE DRYNESS; (2) IF THE TOP AND BOTTOM EDGES AND ALL SURFACES OF THE WOODWORK ARE NOT THOROUGHLY PAINTED OR VARNISHED; OR (3) IF A HIGH QUALITY INTERIOR FINISH IS NOT APPLIED AS SOON AS POSSIBLE AFTER INSTALLATION.

THIS WARRANTY DOES NOT EXTEND TO IMPROPER APPLICATION OF PAINT TO ANY INTEGRITY FACTORY PREFINISH.

### Service and Repair Expense

Marvin Windows & Doors will not, under any condition, be responsible for installation, repainting, refinishing or other similar activities necessary to complete the replacement of the defective window or window component.

Should there be a failure of the air seal for the insulating glass that is standard with all Integrity Windows & Doors, we will replace the insulating glass in sash only, F.O.B. the original point of delivery.

### General Provisions

THE EXPRESS WARRANTIES SET FORTH HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR PARTICULAR PURPOSE. ALL SUCH OTHER WARRANTIES, TO THE EXTENT PERMITTED BY LAW, ARE HEREBY DISCLAIMED AND EXCLUDED BY MARVIN WINDOWS & DOORS. ANY IMPLIED WARRANTIES WHICH ARE NOT EXCLUDED HEREBY, DUE TO OPERATION OF LAW, ARE LIMITED IN DURATION TO THE DURATION OF THE EXPRESS WARRANTY PROVIDED HEREIN FOR THE PRODUCT WARRANTED.

THE REMEDIES SET FORTH ABOVE ARE THE SOLE AND EXCLUSIVE REMEDIES PROVIDED HEREUNDER, AND MARVIN WINDOWS & DOORS SHALL NOT BE LIABLE FOR ANY FURTHER LOSS, DAMAGES OR EXPENSES, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING DIRECTLY OR INDIRECTLY FROM THE USE OF ITS PRODUCTS.

Some states do not allow limitations on how long an implied warranty lasts, so that the above limitation on the duration of any implied warranties not excluded hereby, due to operation of law, may not apply to you. Some states do not allow the exclusion or limitation of incidental and consequential damages so the above exclusion of incidental and consequential damages may not apply to you. This warranty gives you specific legal rights, and you may also have other rights, which vary from state to state.

To make a claim under this Limited Warranty, you must contact the contractor who installed the product or the Integrity distributor or dealer from whom the product was purchased, or, if these persons are not known, contact: Customer Service Manager, Marvin Windows & Doors, Warroad, Minnesota 56763.

Provide the following information to the person contacted:

(A)     your name, address and telephone number;
(B)     description of product for which claim is made;
(C)     date of purchase of product (approximate if exact date not known);
(D)     name of Integrity dealer or distributor from whom purchased (if known);
(E)     nature of product failure; and
(F)     the date of manufacture as stamped on the metal spacer between the panes of glass.



**EXHIBIT**

B

BRYAN GLOVER and BARBARA : IN THE COURT OF COMMON PLEAS
GLOVER, husband and wife, : OF ERIE COUNTY, PENNSYLVANIA
     Plaintiffs :
      :
              v. :
      :
MARVIN WINDOWS and DOORS, : NO. 14007 - 2003
a/k/a MARVIN WINDOWS, a/k/a :
MARVIN LUMBER AND CEDAR :
COMPANY, a/k/a MARVIN WOOD :
PRODUCTS, :
     Defendant :

## CERTIFICATE OF SERVICE

     The undersign hereby certifies that a copy of the Compliant in the above matter

was served on the Defendant by U.S. first class mail on July 1st, 2004 pursuant to Pa.

R.C.P. 440 addressed as follows:


     Marvin Windows and Doors
     P.O. Box 100
     Warroad, MN 56763


                             _____
                                Kenneth W. Wargo



```
                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF PENNSYLVANIA

BRYAN GLOVER and BARBARA    : Civil Action No. 04-209 Erie
GLOVER, husband and wife,   :
          Plaintiffs        :
                            :
     v.                     : Judge Sean J. McLaughlin
                            :
MARVIN WINDOWS and          :
DOORS a/k/a MARVIN          :
LUMBER AND CEDAR            :
COMPANY, a/k/a MARVIN       :
WOOD PRODUCTS,              :
          Defendants        : JURY TRIAL DEMANDED
```

          Deposition of BRYAN GLOVER, taken before
     and by Sonya Hoffman, Notary Public in and for the
     Commonwealth of Pennsylvania on Monday, May 31,
     2005, commencing at 9:00 a.m., at the offices of
     Quinn Buseck Leemhuis Toohey & Kroto, Inc.,
     2222 West Grandview Boulevard, Erie, PA
     16505.


For the Plaintiffs:

     Bryan D. Fife, Esquire
     Quinn Buseck Leemhuis Toohey & Kroto, Inc.
     2222 West Grandview Boulevard
     Erie, PA 16505

For the Defendants:

     G. Jay Habas, Esquire
     Marshall Dennehey Warner Coleman & Goggin
     1001 State Street, Suite 1400
     Erie, PA 16501

               Reported by Sonya Hoffman
               Ferguson & Holdnack Reporting, Inc.

1

---

                      I N D E X

BRYAN GLOVER

     Direct Examination by Mr. Habas . . . . . . . . . 3

     Cross-Examination by Mr. Fife . . . . . . . . . 103


                   E X H I B I T S

     Glover Deposition Exhibit No. 1 . . . . . . . . 17
     Glover Deposition Exhibit No. 2 . . . . . . . . 48
     Glover Deposition Exhibit Nos. 3 & 4 . . . . . . 78
     Glover Deposition Exhibit No. 5 . . . . . . . . 103

2

---

     B R Y A N   G L O V E R, first having

been duly sworn, testified as follows:


               DIRECT EXAMINATION

BY MR. HABAS:


     Q.   Sir, can you give us your full name.

     A.   Brian Karl Glover.

     Q.   And that's B-R-Y-A-N?

     A.   That is correct.  And it's K-A-R-L.

     Q.   Okay.  What's your current address?

     A.   11467 Eureka Road, Edinboro, Pennsylvania.

     Q.   And how long have you lived at that address?

     A.   From 1997.

     Q.   Is that when you moved in?

     A.   Yes.

     Q.   I presume you live there with your wife?

     A.   Correct.

     Q.   Any other persons live at that address?

     A.   Yes.  I have a son, Justin, last name,

M-I-L-E-W-S-K-I.  He's actually my stepson.  And a daughter,

Maryah, that's spelled with a Y.

     Q.   M-A-R-Y-A-H.

     A.   And her last name is Glover.

     Q.   And how old is she?

3

---

     A.   She's -- she will be nine this year.

     Q.   How about Justin?

     A.   He is 18 this year.

     Q.   Any other people live at that location?

     A.   Just the four of us.

     Q.   Bryan, have you ever given a deposition like we're

doing here today?

     A.   No.

     Q.   I'm sure your attorney has given you some

instructions on how we're going to proceed, I just want to

reiterate to keep your voice up, as you have been.  If you

have any questions or don't understand a question, please

let us know.

          At times your counsel may need to step in and

raise an objection or ask for clarification.  And certainly

try not to talk over either one of us so that the court

reporter can get things down clearly, okay?

     A.   Okay.

     Q.   Where are you currently employed?

     A.   Rabe Environmental Systems here in Erie.

     Q.   How long have you been employed there?

     A.   Maybe like five and a half years now.

     Q.   What do you do there?

     A.   I'm an HVAC service technician, heating, air

conditioning, ventilation, refrigeration.

4

1    Q.    Is that a full-time job?
2    A.    Yes.
3    Q.    What particular duties do you perform for Rabe?
4    A.    I am currently a building trades journeyman
5    serviceman -- service tech. My duties include preventative
6    maintenance, repair, installation of heating, air
7    conditioning, and refrigeration systems.
8    Q.    Does any of your work for Rabe involve
9    installation or maintenance for windows or doors?
10    A.    No.
11    Q.    Where did you work prior to Rabe?
12    A.    A company called McCarl's Services.
13    Q.    Can you spell that.
14    A.    M-C-C-A-R-L-'-S.
15    Q.    What did you do for McCarl's?
16    A.    Same job.
17    Q.    How long?
18    A.    Eight and a half years.
19    Q.    Where are they located?
20    A.    Here in Erie as well.
21    Q.    Why did you leave McCarl's to go to Rabe?
22    A.    Achieve journeyman status. In other words, I'm
23    high-priced.
24    Q.    A member of the union?
25    A.    Yes, Local 47.

5

---

1    Q.    Is that the electrical workers union?
2    A.    Yes, plumbers and steamfitters.
3    Q.    How long have you been a member of that union?
4    A.    Since '93.
5    Q.    You don't work out of the union hall, you have
6    full-time jobs in these locations, right?
7    A.    Yes. I do work out of the union hall, everybody
8    does.
9    Q.    You don't have to report and work out of there?
10    A.    No.
11    Q.    Where did you work prior to McCarl's?
12    A.    Zurn General Air Division for Zurn Industries.
13    Q.    What years?
14    A.    That, I don't remember the exact years, but it was
15    '88 to '92, I do believe.
16    Q.    Somewhere around there?
17    A.    Yes.
18    Q.    What did you do for Zurn?
19    A.    Service technician for the compressed air dryers.
20    Q.    Just to be complete, what did you do for McCarl's?
21    A.    Same job I do for Rabe.
22    Q.    Exact same type of work?
23    A.    Exact same work.
24    Q.    And have you ever been terminated from any
25    employment?

6

---

1    A.    (Witness shakes head.) Not recently, not since I
2    was a child.
3    Q.    All right. Have you ever been convicted of a
4    crime for any reason?
5    A.    No.
6    Q.    Have you ever been involved in a lawsuit before?
7    A.    No.
8    Q.    Let me turn to your house on Eureka Road in
9    Edinboro, you said you moved in 1997; is that correct?
10    A.    Correct.
11    Q.    When was the house built?
12    A.    We started construction in 1996.
13    Q.    And who built the house?
14    A.    Myself.
15    Q.    Did you build all of the house or just certain
16    parts of it?
17    A.    Certain parts of it. I did subcontract some out.
18    Q.    What parts did you subcontract out?
19    A.    The basement.
20    Q.    The block?
21    A.    Excavation, the block floor -- the concrete work,
22    basically.
23    Q.    All right. What else did you sub out?
24    A.    The roof, having the shingles put on.
25    Q.    What else?

7

---

1    A.    Siding.
2    Q.    Anything else?
3    A.    I did have a gentleman by the name of Mike Paris
4    and his crew help me set the windows and doors as well as
5    some of the wall panels.
6    Q.    Anything else that you subbed out?
7    A.    That's all I can remember.
8    Q.    How long did it take to build your house?
9    A.    Currently under construction -- no.
10    Q.    Okay.
11    A.    To raise the structure, approximately, a year and
12    a half.
13    Q.    When you say "raise the structure", what do you
14    mean?
15    A.    The structure was up, sided, we were in it for
16    about a year and a quarter before we moved into it. You
17    know, finished the carpet, trim, and so on and so forth.
18    Q.    So was it a year and a half from the time you
19    started construction until the time you moved in; is that
20    what you mean?
21    A.    I'm going to say probably more about a year and a
22    quarter or so. I don't really remember the exact dates.
23    Q.    So I take it you worked on this house while you
24    were employed elsewhere?
25    A.    Correct.

8

1  Q.  Had there been a home at that location before that
2  you built over, that you destroyed, or was it a brand-new
3  construction?
4  A.  A brand-new construction.  There was a structure
5  on the property in the early 1950s that was started in a
6  different location on the property and was abandoned.
7  Q.  And you did not use any of the foundation from
8  that?
9  A.  No.
10  Q.  Now, you said a gentleman by the name of Mike
11  Paris helped you set the windows and doors; is that correct?
12  A.  That is correct.
13  Q.  How do know Mike Paris?
14  A.  He was -- I don't know exactly what his position
15  was, but it was with Loc, Incorporated.
16  Q.  That's L-O-C?
17  A.  L-O-C, yes.  I don't know if he was the engineer
18  or just a salesman, but he's the one that I worked with to
19  draw up the blueprints for the house.  And he was
20  well-versed in construction.
21  Q.  Had you met him before?
22  A.  Myself, no.
23  Q.  How about your wife?
24  A.  I can't speak for her, I do believe not.  She
25  knows more the real estate than I do.  He's part of Paris

9

1  A.  Correct.
2  Q.  So you don't have to start from scratch with all
3  the lumber and framing of the house.
4  A.  Correct.
5  Q.  Okay.  Now, at what point did Mike Paris become
6  involved with you in the windows and doors?
7  A.  He actually became involved with giving me a hand
8  when we were setting the wall panels and just continued on.
9  Q.  Did the wall panels have precut areas for windows
10  to be inserted?
11  A.  Correct.
12  Q.  Was that part of the design of the house?
13  A.  Yes.
14  Q.  Who decided where the windows were going to be
15  located?
16  A.  That was off the blueprints.  The house was
17  basically designed between myself and Mike Paris.  I had my
18  ideas, he made sure we did it structurally correct -- or
19  Loc, I should say, made sure it was done structurally
20  correct.  Like I said, I don't know if he was the engineer
21  or just sales, I don't believe engineer but I won't swear to
22  that.
23  Q.  Did you have an architect design the house at all?
24  A.  That's what Loc did for us.
25  Q.  So they had their own architect?

11

1  Homes Construction.
2  Q.  Did he work for Paris Homes at that time in '96 or
3  did he work for Loc?
4  A.  He worked for Loc is where I met him.  Whether he
5  worked for Paris or not, I do not know.
6  Q.  Did you have any prior relationship with him or
7  ever worked with him before?
8  A.  No.
9  Q.  How is it that you hooked up with Loc to build
10  this house?
11  A.  That's who I -- who we had do the floor plans for
12  the house.  And I don't know if you're familiar with Loc's
13  products -- you know, you've got to buy your timber and
14  stuff somewhere.  They design houses and build them in
15  panels and send the panels out to the field to be squared up
16  and installed.
17  Q.  What do you mean by panels?
18  A.  Basically, your studding and outside sheeting.
19  Rough window and door openings are already cut in, headers
20  are in place, and the panels range anywhere from -- exactly,
21  I don't remember, but from 8-foot to like 14-feet long.
22  Q.  So there would be premade walls, for instance?
23  A.  Correct.  Basically, that's what it is.
24  Q.  So they are trucked to the location and you
25  assemble the walls, panel by panel, that fit together?

10

1  A.  Yes.
2  Q.  Mike Paris, is he an architect?
3  A.  I do not know for sure.  That would be a question
4  that he would have to answer.
5  Q.  Can you tell me how far in the approximately
6  year-and-a-quarter to year-and-a-half time that this home
7  was under construction that you installed the windows and
8  doors?
9  A.  Exactly, I don't remember, but I'm going to say
10  fall of 1996.  I'm not for sure of the exact date.
11  Q.  Can you describe for me the general layout of the
12  house in terms of how many floors and how it's situated?
13  A.  As far as floors, it's a single-floor dwelling
14  with a basement, which is not a full basement, there was one
15  small crawlspace.
16  Q.  How many square feet, approximately?
17  A.  Living space, right now, as far as first floor is
18  2,400, I do believe, somewhere around there.
19  Q.  How many rooms do you have on the first floor?
20  A.  How many rooms?
21  Q.  Yes.
22  A.  Basically, the master bedroom, master bath, his
23  and her walk-in closets, two bedrooms, general bath.  I
24  wouldn't call it rooms, but it's one large open area, which
25  is divided up into kitchen, dining room, some people call it

12

**Page 13**

1  a great room, or family room.

2      Q.    Garage?

3      A.    Detached.

4      Q.    Was it built at the same time?

5      A.    No.

6      Q.    Do you know how many windows this home has?

7      Q.    Panes or units?

8      Q.    Why don't you tell me the number of units.

9      A.    Approximately, 32.

10     Q.    Obviously, more panes than that?

11     A.    Yes.

12     Q.    Were all of the window units installed at the same

13 time originally?

14     A.    All except for the front door, which is a

15 different manufacturer.

16     Q.    Did you consider the front door to be one of the

17 units that you mentioned?

18     A.    No.

19     Q.    So when we're talking about windows, these are all

20 windows that are on the exterior framing of the house; would

21 that be correct?

22     A.    Correct.

23     Q.    And since it's a single-floor dwelling, these are

24 all on the first floor?

25     A.    Nine are in the basement.

**Page 14**

1      Q.    How many course basement do you have?

2      A.    13 courses deep.

3      Q.    So if there are nine in the basement, that

4 leaves --

5      A.    23 above grade -- well, they're all above grade,

6 but first floor.

7      Q.    Are you including any doors in those 23 on the

8 first floor?

9      A.    Yes.

10     Q.    How many of those are doors?

11     A.    Two units.

12     Q.    Front and rear door?

13     A.    No, French doors.

14     Q.    Would those both be in the rear of the home?

15     A.    Actually, one would be in the south -- well,

16 actually both of them are facing the south. And they are in

17 the side and rear of the house, one each.

18     Q.    Of the windows, are they all the same type or --

19 strike that. Can you describe for me the unit type that you

20 have. Are they all the same?

21     A.    Casement.

22     Q.    They are all casement?

23     A.    Not all of them are casement, some of them are

24 fixed.

25     Q.    The casement has the handles to open up, correct?

**Page 15**

1      A.    Correct -- they roll out sideways, not like an

2 awning.

3      Q.    Do you know how many casement you have versus

4 fixed?

5      A.    Out of the 23, eight panels would be fixed.

6      Q.    How many units are fixed?

7      A.    Eight.

8      Q.    You said panels.

9      A.    Well, sorry about that.

10     Q.    That's all right. I just want to make sure we're

11 accurate. So of the 23 windows that you have on the first

12 floor, eight of them are fixed and the rest are casement; is

13 that correct?

14     A.    Yes. And that's an approximation. I'm not going

15 to say for sure that there's 23 windows in the house, I

16 don't remember exactly.

17     Q.    Give or take a couple?

18     A.    I'm kind of just counting around the house.

19     Q.    If at any time during your testimony you remember

20 a different number, let us know just so we can be accurate.

21     A.    I could actually count them, we have photos of the

22 house.

23     Q.    Can you refer to something that would assist you

24 in that?

25     A.    Actually, I don't know if we have the floor plans

**Page 16**

1 or not for the house.

2      Q.    I've not seen them, so if you can refer to them.

3      MR. FIFE:  What are you looking for?

4      THE WITNESS:  An actual blueprint of the house.

5      A.    If not, I can produce that, but not today.

6      Q.    Here's the infrared scan picture of the whole

7 house.

8      A.    Yeah. 23 exactly, plus the nine in the basement,

9 which would be a total of 32 windows. I thought I'd

10 remember my house.

11     Q.    Can you tell me over what period of time in terms

12 of days or weeks the windows were installed?

13     A.    How long it look for installation, is that what

14 you're asking?

15     Q.    Yes.

16     A.    Exactly, I don't remember, but I'm going to assume

17 less than a week.

18     Q.    Do you remember what season or time of the year?

19     A.    Autumn, I do believe.

20     Q.    And other than Mike Paris, did you have anyone

21 else assist you in the installation?

22     A.    His crew. I don't know their names, who he had

23 helping him at the time.

24     Q.    At any time after the windows were installed, was

25 there any inspection performed of the windows, themselves,

**Page 17**

1  by anyone?
2      A.   No, until we started having problems.
3      Q.   Did you ever have any final inspection of the
4  home, itself?
5      A.   Wiring.
6      Q.   Just the wiring?
7      A.   Yes.  That was the only thing required by code at
8  that time.
9      Q.   Did you have to obtain a certificate of occupancy
10  for the residence?
11      A.   No, not required at that time.
12      Q.   So other than the wiring, there's never been any
13  inspection of the property in terms of complying with code
14  or to determine any compliance or regulation issues?
15      A.   As far as the structure goes, no.
16      Q.   How about the windows?
17      A.   No.
18      Q.   But there has been sewage inspection?
19      A.   Of course -- I should say septic.
20      Q.   Do you recall who you purchased the windows from?
21      A.   Loc, Incorporated.
22          (Glover Deposition Exhibit No. 1 marked for
23          identification.)
24      Q.   I'm going to show you a series of four documents
25  that I'm going to collectively mark as Exhibit No. 1 and ask

17

**Page 18**

1  you to take a look at them.
2      A.   (Witness complies.)
3      Q.   Have you seen those before?
4      A.   Yes, I have.
5      Q.   Can you tell us what they generally are.
6      A.   Three are the bill of lading for the Marvin
7  windows and doors.
8      Q.   What's the last page?
9      A.   The last page would be for the Please front door
10  assembly.
11      Q.   What kind of front door assembly was that?
12      A.   Please was the manufacturer.
13      Q.   Do you know how to spell that?
14      A.   P-L-E-A-S-E, Please.
15      Q.   Let's turn to the first three pages, top
16  right-hand corner of those pages identify a date of 8/2/96;
17  do you see that?
18      A.   Correct.
19      Q.   Would that reflect the day on which the windows
20  were purchased?
21      A.   That, I don't remember for the exact date, but
22  that would be close to it.
23      Q.   You'll see on the second and third page a date
24  shipped of 10/11/96; do you see that?
25      A.   Yes.

18

**Page 19**

1      Q.   Would that accurately reflect the date on which
2  the windows were shipped to your facility?
3      A.   Yes.  Somewhere around that date, exactly I don't
4  remember.
5      Q.   To your recollection does that help you identify
6  the time frame when you received the windows?
7      A.   Autumn, October.
8      Q.   That's not a date that they would have been
9  shipped from the manufacturer, that's the date that they're
10  shipped actually to the job site.
11      A.   To the job site, yes.
12      Q.   And you'll see two signatures on Pages 2 and 3; is
13  that your handwriting?
14      A.   Yes, it is.
15      Q.   Would you have signed off on the receipt of those?
16      A.   Yes.
17      Q.   Would it have been on or about the date shipped?
18      A.   Should be around when they were shipped.
19      Q.   You see on Pages 2 and 3 the letters SK under
20  checked and delivered; do you know who those refer to?
21      A.   I would assume that it was their delivery driver;
22  for sure, I do not know.
23      Q.   Were the items in the first three pages all
24  shipped to your residence at the same time?
25      A.   No.

19

**Page 20**

1      Q.   Can you tell us about that.
2      A.   I would say that on the first page, bottom -- last
3  entry, nine rotor operator windows, you can see it says,
4  shipped 8/2/96.  Those would be the nine basement windows.
5      Q.   Just that last item on the first page?
6      A.   Just that last item, which would be approximately
7  the time that the rest of the house was being built.
8      Q.   Now, let's go to the first page.  It indicates
9  that you had a residence on West 23rd at the time.
10      A.   Correct.
11      Q.   Is that where you lived prior to moving to Eureka
12  Road?
13      A.   That is correct.
14      Q.   How long did you live on West 23rd?
15      A.   Since 1992, September 5th.
16      Q.   How is it you remember that date so accurately?
17      A.   Because that's the day that the wife and I got
18  married and she owned the house on West 23rd Street.
19      Q.   Did you live at the 23rd Street location from that
20  date until you moved into the new home in Edinboro?
21      A.   That is correct.
22      Q.   Now, as far as the description of the windows that
23  you see on Page 1, other than the last items, which you
24  identified as being basement windows, do these items reflect
25  windows that were installed in the first floor of your home?

20

1    A.    By model numbers, I cannot say for sure.  But I
2  would assume correctly that these are the ones that were
3  installed in my home.
4    Q.    You'll see under the description, ship, S-H-I-P,
5  it has various numbers; is it your understanding that that
6  reflects the quantity of windows for each of those
7  descriptions?
8    A.    I would assume that is what it is for because
9  there's an order number then a quantity shipped.
10    Q.    So on the first page, if you add up the shipping
11  numbers, you see there would have been a total of 13 windows
12  plus the nine in the basement; does that look right to you?
13    A.    Let's see here three, four, five, seven, 10, yes.
14    Q.    By looking at the information on Page 1, can you
15  tell us where those windows would have been installed in
16  your home.
17    A.    Not without knowing what the ICA number is.  I
18  have a rough guess on some, but it's just a guess.
19    Q.    Just to be clear then, this first page of this
20  exhibit reflects windows that were purchased and shipped to
21  your home on Eureka Road, correct?
22    A.    Correct.
23    Q.    And the bottom one indicates that nine were
24  shipped on 8/2/96; would that be correct?
25    A.    That would be correct.

21

---

1    Q.    Those are basement windows, right?
2    A.    I don't think you have the full list, either.
3    Q.    Let's just go through Page 1 first, nine basement
4  windows; would you agree?
5    A.    Uh-huh.  The last entry, yes.
6    Q.    And then 13 first-floor windows, at least
7  according to the shipping numbers.
8    A.    I would agree.
9    Q.    So that adds up to a total of 23 for the first
10  page.
11    A.    Uh-huh.
12    Q.    You've got to say yes or no.
13    A.    Yes, sorry.
14    Q.    Let's go to Page 2, you see in Item No. 4, it
15  looks like four more windows; would you agree?
16    A.    Correct.
17    Q.    And would that reflect windows also installed on
18  the first floor?
19    A.    Yes.
20    Q.    Okay.  So that takes us to a total of 27.  And if
21  you look at Page 3, it looks like two more items, correct?
22    A.    Uh-huh.
23    Q.    Do you know what those reflect?
24    A.    Brass hardware, low e argon, white, jam.  I would
25  assume that --

22

---

1    MR. FIFE:  If you know.
2    A.    I don't know for sure.
3    Q.    Do you know if those are windows or just hardware?
4    A.    I don't know for sure.  I'd have to look at the
5  model number in the catalog.
6    Q.    I think you indicated that we may not have the
7  complete bills of lading for all the windows purchased.
8    A.    Correct.
9    Q.    Do you have copies of all the bill of lading
10  documents?
11    A.    I don't know for sure.
12    MR. FIFE:  What you have is what we have.
13    A.    We've dug through all -- I'm going to say a
14  polygon, it's looks like the one we're missing -- it's not
15  for sure, but I think it's for the custom windows, the
16  custom-cut windows.
17    Q.    You're looking at the third page of this exhibit;
18  how many of those are there?
19    A.    There's four custom-cut windows, and there is four
20  more custom windows.  So I'm going to assume that that's
21  probably what's not there.
22    Q.    The third page has the word "polygons" written on
23  it; do you see that, that P-O-L-Y-G-O-N-S, is that your
24  writing?
25    A.    No.

23

---

1    Q.    Do you know what that refers to?
2    A.    I would assume that's the custom-cut windows.
3    Q.    Would they have been shipped around the same time
4  in 1996?
5    A.    They should have been in '96, for sure, I don't
6  remember.
7    Q.    Where were the custom-cut windows located in your
8  home?
9    A.    Northeast side of the house.
10    Q.    Why did you require custom windows for that
11  location?
12    A.    Because of the fireplace.
13    Q.    And you indicated that there would have been four
14  more custom windows for a total of eight.
15    A.    Same wall.
16    Q.    Referring to the -- in the binder you had referred
17  to earlier, can you identify where those windows would be
18  located.
19    A.    Sure can.
20    Q.    For the record, I think we are looking at a binder
21  with photographs of the home taken by or on behalf of the
22  Plaintiffs.
23    A.    Yeah, it's actually done by this company.
24    Q.    You're pointing to a document --
25    A.    I'm just showing you the company.

24

1    Q.    It's called Absolute Infrared Inspection Services;
2  is that correct?
3    A.    Correct, so you have their name.
4    Q.    We're looking at a page that has a fireplace on it
5  and there are a total of eight windows, four on either side
6  of the wall where the fireplace is located; is that correct?
7    A.    That's correct.
8    Q.    Would those be the eight custom windows that you
9  are referring to?
10    A.    Yes.
11    Q.    And those are not reflected in the bill of lading
12  that we have here as Exhibit No. 1.
13    A.    I think so.
14    Q.    Are there any other windows that are not reflected
15  in that document?
16    A.    Absolutely, for sure, I do not know.  I'm
17  guessing.
18    Q.    Let's look to the last page of that exhibit, and
19  that has a date of 7/24/96; do you know what this refers to?
20    A.    I'm -- for sure, I don't really know.  I'm
21  assuming a front door.
22    Q.    To your understanding, does this page identify any
23  of the windows that were purchased for your home?
24    A.    No, I'm just guessing.
25    Q.    None of those documents appear to have a price on

25

1  of the building.
2    Q.    Were you present when all this was done?
3    A.    Yes.  They were also, around the exterior frame of
4  the window, sealed in with foam -- well, expanding foam
5  insulation.
6    Q.    Anything else about the installation of the
7  windows that you recall?
8    A.    No.  Just done per the manufacturer of the window.
9    Q.    Can you tell us how the openings for the windows
10  were prepped.
11    A.    The side of the building was felted -- of course,
12  the felt was brought into the opening and they made sure
13  there wasn't any nails or anything protruding into the
14  siding.
15    Q.    Was the felt brought in on all four sides of the
16  opening?
17    A.    Correct.
18    Q.    Do you remember what kind of felt was used?
19    A.    15 pound.
20    Q.    Did you perform any of that work yourself?
21    A.    Yes.
22    Q.    How far into the opening did you bring it?
23    A.    Approximately, halfway.  Six-inch -- 2x6
24  construction wall, so approximately three inches,
25  approximately.

27

1  it; do you know what the total cost was for the windows,
2  themselves, that were purchased in 1996 for your home?
3    A.    I do not remember.
4    Q.    Any ballpark idea?
5    A.    I don't remember off my head (sic).
6    Q.    Do you know how they were purchased?  Was it that
7  you had to pay by check or some other payment in order to
8  purchase them from Loc, or what the payment plan for
9  that?
10    A.    It was standard construction -- new construction
11  loan, it came out in draws.  As parts of the house were
12  completed, you receive your draw from the bank and pay it
13  accordingly.
14    Q.    Were you present when the windows were installed
15  in the home?
16    A.    Yes.
17    Q.    Can you describe for us that method for
18  installation of the windows, how they were installed.
19    A.    I'm no expert on windows, but it's pretty
20  straightforward.  These are what they call a -- have a
21  nailing flange, they're on the outside of the window.  The
22  hole -- the openings were prepped, the windows set in place
23  and squared.
24    Q.    Go ahead.
25    A.    And then they were sealed and nailed to the side

26

1    Q.    How did you fasten them to the 2x6 --
2    A.    Staples.
3    Q.    Anything else that you did as far as preparing the
4  openings for the windows other than the felt?
5    A.    No.
6    Q.    You said they were set in place and squared; can
7  you describe how that was done.
8    A.    Set into the opening and squared and leveled using
9  shims to make sure the window was sitting level and square
10  and it wasn't being bound before it was nailed to the house.
11    Q.    Did you have to make any adjustments to the
12  openings in order to accommodate the windows?
13    A.    I do not remember.
14    Q.    By adjustments, meaning any use of additional
15  shims or wood or other framing in order to fill in the size
16  of the window frames?
17    A.    I do not remember for sure, but I'm assuming not.
18  They were very precise -- Loc was very precise with their
19  ordering.
20    Q.    You don't recall any instance where the windows
21  did not fit the opening size?
22    A.    No.
23    Q.    You next said they were sealed; can you describe
24  the method in which they were sealed.
25    A.    Latex caulking around the outside.  And like I

28

1  said earlier, foamed around the inside of the -- or the
2  outside of the window frame to the stud.
3      Q.   Was the caulking put in place around the entire
4  parameter of the window?
5      A.   Correct.
6      Q.   Do you know how wide the caulking was placed?
7      A.   No, I don't.
8      Q.   Do you know what type of caulking was used?
9      A.   Latex.
10     Q.   Do you know what brand?
11     A.   No, I don't.  I remember a lot of it, but not all
12 of it.
13     Q.   That's all right.  I'm just asking to see what you
14 remember.  You then said they were nailed to the building;
15 can you describe that process.
16     A.   There's a flange that's attached to the window
17 that folds out and lays flat to the outside wall, and then
18 they have holes in them for nailing.  They were nailed in.
19     Q.   Did you participate in that at all?
20     A.   Some, yes.
21     Q.   These are obviously nailed in before you put the
22 siding on, correct?
23     A.   Correct.  The siding covers the nails and flange.
24     Q.   Were the windows nailed in through all the precut
25 locations, or did you alternate every other hole?

29

1      A.   Great Stuff.
2      Q.   Great Stuff, is that what it's called?
3      A.   That's what it's called.
4      Q.   Where did you get that from?
5      A.   Local hardware, probably Lowe's, Home Depot --
6  actually, it would have been Builder's Square at the time or
7  Valu Home Centers.
8      Q.   Was that the brand or was that just the name?
9      A.   That's the brand, it's called Great Stuff.
10     Q.   You said you used minimal expanding foam?
11     A.   Correct.
12     Q.   Did you use that around the entire parameter of
13 the --
14     A.   Windows and doors, yes.
15     Q.   That was done from the inside?
16     A.   Inside.
17     Q.   Was that before the walls were framed or the walls
18 were --
19     A.   Finished.
20     Q.   -- finished?
21     A.   Yes.
22     Q.   Did anyone assist you with that?
23     A.   Not to my knowledge.
24     Q.   Can you tell me when the foam expanded, about what
25 was the width around the window when it was completed?

31

1      A.   All the precuts, right where they were supposed to
2  be.
3      Q.   You talked about sealing the inside; can you
4  explain how that was done.
5      A.   Expanding foam in between the window frame and the
6  framing of the structure.
7      Q.   And who did that?
8      A.   I did.
9      Q.   Why was that done?
10     A.   To make sure that I had a good seal to the
11 structure and make sure it was well-insulated.
12     Q.   Was that within any of the installation
13 instructions that you had seen?
14     A.   I used what they -- what the installation
15 instruction said was use minimal expanding foam and that's
16 what I used.
17     Q.   What do you mean by minimal expanding?
18     A.   There's three different -- as far as I know
19 there's three different expansion rates for the foam.
20 There's a minimum standard and a high expansion.  If you
21 would use a higher expansion one, what it could do is
22 actually push the window casing in, which I didn't want to
23 do, so that's why I used the minimal expanding so it doesn't
24 expand out and put pressure on the window.
25     Q.   Do you know what type of foam you used?

30

1      A.   I don't really remember.  It varied.  I know it
2  was minimal, but I don't remember the exact size.
3      Q.   Did you take any pictures while you were
4  installing the windows?
5      A.   I don't think I had any pictures of the installing
6  of the windows.  My wife would know that answer better than
7  I would.
8      Q.   Did you have any difficulty installing the
9  windows?
10     A.   No.
11     Q.   Was any inspection done by Mike Paris of the
12 windows after they were installed?  Did he go and check to
13 make sure that the windows were installed correctly?
14     A.   Yes.
15     Q.   How did he do that?
16     A.   Visually, I would imagine.
17     Q.   Do you remember seeing him actually do that?
18     A.   No, I don't.
19     Q.   Would it be fair to say that you were responsible
20 for caulking and foaming around the windows?
21     A.   Yes.
22     Q.   And you were responsible also for nailing the
23 windows to the outside frame?
24     A.   Yes.
25     Q.   And as far as actual placement of the windows into

32

the opening, that would have been done with you and Mike
Paris?

    A.    Uh-huh.

    Q.    You've got to say yes or no.

    A.    Yes.  Everything was according to the blueprints
of the house.

    Q.    Anything else that you, yourself, did as far as
the installation of the windows, other than what you've told
me?

    A.    Other than sealing the windows, staining,
varnishing, of course, putting the trim on.

    Q.    Now, after the windows were installed, did you
finish framing the house before you varnished them or sealed
them?

    A.    The house was completely framed before the windows
were put in.  The framing was on, the roof was completed,
the whole outside of it was felted, the windows were one of
the last framing things to go in.

    Q.    What was the next thing that you did or that Mike
Paris did as far as the windows and doors were concerned?

    A.    We installed them and I worked on the inside of
the house, wiring, insulation.

    Q.    What about the windows, what was the next thing
you did as far as the windows were concerned?

    A.    The next thing would have been after the walls

---

were completed, as far as Sheetrocked and primered, would
have been to finish the interior wood cladding to the
windows.

    Q.    And describe what you did with that.

    A.    Of course, cleaned it.  Sealed it via staining
with Minwax Stain, I don't remember the mix.  And then they
were sealed with Marine Spar Varnish, or better known as
spar varnish.

    Q.    Now, when you sealed with the Minwax, can you tell
me what areas of the windows you sealed.

    A.    The interior wood cladding of the pane and the
framework of the windows on the inside.

    Q.    How many coats did you use?

    A.    The stain, you only use one coat, of course.

    Q.    Did you prime it at all before using the Minwax?

    A.    Yes, it was.  It was primed with a diluted mix of
shellac to seal the grains of the wood.

    Q.    When you say "diluted mix", do you know what the
dilution was?

    A.    As a matter of fact, right of the top of my head I
remember, standard is about 50/50.

    Q.    What did you dilute it with?

    A.    Mineral spirits.

    Q.    So approximately a 50/50 mix of the mineral
spirits and shellac.

---

    A.    Yes.  That's to seal the grain so the stain
doesn't dig in.

    Q.    And then you put the Minwax on.

    A.    Stained them with Minwax and then used the Marine
Spar Varnish for the final coat -- the final coats.

    Q.    So do you use one coat of the primer and one coat
of the Minwax and one coat of the spar finish?

    A.    Spar finish, I do believe we put three on, but I
don't remember for sure.  I do believe my wife may have --
she may remember.

    Q.    Over what period of time was this process done?

    A.    I don't remember exactly.

    Q.    Days, weeks, months?

    A.    Probably weeks.

    Q.    Would that also have been done in the fall of
1996?

    A.    No.

    Q.    When would that have been done?

    A.    I don't remember, but I'm going to assume early
spring -- springtime of '97.

    Q.    So the finishing of the wood cladding would have
been done in the spring of '97; is that right?

    A.    Right.

    Q.    Did you flash the opening for the windows other
than the way you had described?

---

    A.    As far as --

    Q.    Did you use anything besides the felt paper around
the windows before installing?

    A.    No.  They're sheeted complete.

    Q.    Pardon?

    A.    I said they were sheeted complete, the way it
came.

    Q.    Do you remember what the nailing pattern was for
the windows?

    A.    Not exactly, other than just being the flange
style.

    Q.    Did you have to assemble any of the windows on
site?

    A.    No.  They come pre-assembled.

    Q.    They were then field-installed by you and Mike
Paris?

    A.    Correct.

    Q.    Did you add any flashing around the windows,
themselves, at any time?

    A.    No.

    Q.    Any shields for water or ice did you add?

    A.    No, other than the siding -- you know, standard
siding practices.

    Q.    And as far as siding, you used the vinyl siding.

    A.    Correct.

**Page 37**

1  Q.   Did you have installation instructions for the
2  windows at the time you installed them?
3  A.   Every unit.  Still own them.
4  Q.   The original installation instructions?
5  A.   Correct.
6  Q.   They're the same for each window; aren't they?
7  A.   Correct.
8  Q.   Did you read them before installing the windows?
9  A.   Of course.
10  Q.   Now, when you're installing windows, were you
11  relying on Mike Paris for any advice or guidance or were
12  they pretty much your responsibility?
13  A.   Both -- well, it's actually my responsibility
14  because it was my home.  But I used -- had Mike help me due
15  to the fact that some of the units were quite large and
16  heavy.  I mean, one person couldn't install it on their own.
17  Q.   Did you require a lift of any type to move any of
18  the windows into place?
19  A.   Manpower.
20  Q.   Other than the manpower on site, did Mike Paris do
21  anything with the insulation of the windows?
22  A.   As far as --
23  Q.   Well, you've described what you've done, and I
24  just want to make sure I understand what Mike Paris did as
25  opposed to you when it comes to the installation.

**Page 38**

1  A.   Pretty much the same thing, except for -- you
2  know, he helped me actually get them physically in the wall
3  and nailed in, and the rest I did.
4  Q.   Just so we're clear, he physically helped you put
5  them in place and nail them into the --
6  A.   Square them up and nail them, yes.  And make sure
7  I got the right --
8  MR. FIFE:   Let him finish his question.
9  A.   Sorry.
10  Q.   Mike Paris physically helped you put the windows
11  in place, square them in, and nail them into the frame.
12  A.   Correct.
13  Q.   Other than that, you performed all the additional
14  tasks to put the windows into their final location and seal
15  them and caulk them?
16  A.   To seal them and caulk them in, yes.
17  Q.   Okay.  Was there anyone in Mike Paris' crew that
18  helped you put the windows in place that you can recall?
19  A.   I don't remember any of their names.
20  Q.   We're talking about windows, but did you also
21  install doors in your home?
22  A.   Yes.
23  Q.   And referring back to Exhibit No. 1, can you
24  identify any items there that reflect doors that were
25  purchased and installed in your home?

**Page 39**

1  A.   Like I said, without knowing the model numbers,
2  which I don't remember which one is which, I couldn't
3  identify them off of the bill of ladings, no.  But I can
4  identify them in the building.
5  Q.   And you said there were two sets of French doors?
6  A.   Correct.
7  Q.   Were those installed around the same time as the
8  windows?
9  A.   Yes.
10  Q.   Did you follow the same process for installing the
11  doors?
12  A.   Correct.
13  Q.   Any different process as far as installing the
14  doors as opposed to the windows?
15  A.   Yes, because there was a threshold that had to be
16  attached to the floor.
17  Q.   Who put that in?
18  A.   I did -- between Mike and myself.  It comes
19  premanufactured with the unit, there's just another step to
20  do to make sure that's well-supported.
21  Q.   Do you recall what that step was?
22  A.   It's just making sure the flooring was level off
23  the opening and the unit actually sets in and it's sealed to
24  the floor versus just in the wall.
25  Q.   How did you seal the French doors?

**Page 40**

1  A.   The same way I did the windows, foam and latex.
2  Q.   The same caulking, the same foam?
3  A.   Yes.  And approximately, the same time.  Exactly,
4  I don't remember.
5  Q.   At any time when the windows were installed, did
6  you identify or see any defect or crack or problem with the
7  windows, themselves?
8  A.   I'm just thinking here.  At time of installation?
9  Q.   Yes.
10  A.   None that I can remember, I'm just guessing.
11  Q.   Just so I'm clear, when you constructed this home,
12  did you install any windows that were not purchased through
13  Loc?
14  A.   No.  They were all purchased through Loc.
15  Q.   And they were all the windows that have been
16  identified as Integrity windows?
17  A.   Yes, Marvin Integrity windows.
18  Q.   So the installation did not involve any other
19  types of windows?
20  A.   Other than the front door was the Please unit, and
21  that came at a later time.
22  Q.   All right.  Now, I understand at some point that
23  certain of the windows were replaced.
24  A.   Yes.
25  Q.   Can you tell me when that occurred.